**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
Email:  jpafiti@pomlaw.com
*- additional counsel on signature page -*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT DODICH and JAYME GOTTS-DODICH, Individually and on Behalf of All Others Similarly Situated, | Civil Action No.: |
| Plaintiff(s), | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| NIANTIC, INC., THE POKÉMON COMPANY, and NINTENDO CO. LTD., | |
| Defendants. | |

Plaintiffs Scott Dodich and Jayme Gotts-Dodich (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants Niantic, Inc. ("Niantic"), The Pokémon Company ("Pokémon Co."), and Nintendo Co. Ltd. ("Nintendo") (collectively, "Defendants"), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PRELIMINARY STATEMENT**

1.      This is a class action against Defendants, arising from the popular *Pokémon Go* mobile game, developed by Niantic and based on a media franchise co-owned by Nintendo and marketed and licensed by Pokémon Co., with millions of players worldwide.

2.      *Pokémon Go* is the latest iteration of the immensely popular Pokémon media franchise, which consists in large part of a series of video games in which players take on the role of "trainers" with the goal of capturing and collecting fantasy creatures called Pokémon. Released on July 6, 2016 in the United States, *Pokémon Go* is an "augmented reality" game in which players use their smart phones to "catch" Pokémon in the players' real-world surroundings by utilizing the GPS, camera, and gyroscope features on users' mobile devices.  When a player comes in close proximity to GPS coordinates determined by a Niantic algorithm, the game uses the phone's camera mode and gyroscope to display the image of a Pokémon, superimposed over the real-world image displayed on the player's phone screen, as though the Pokémon existed in the real world.  (*See* Figure 1.)  By swiping their phone screens, players may then attempt to "catch" the Pokémon to add it to their virtual collections.



*Figure 1*

2

3.     When the game detects, via GPS, that players are in the vicinity of certain real-world locations, the GPS coordinates of which were selected and programmed into the mobile application by Niantic and known to *Pokémon Go* players as "Pokéstops" and "Pokémon gyms," the players gain access to potentially vital in-game items, which they can use to catch Pokémon, among other purposes, or gain the opportunity to engage in virtual "battles" with other *Pokémon Go* players.

4.     *Pokémon Go* was an immediate success.  As of July 23, *Pokémon Go* had been downloaded more than 30 million times and had earned more than $35 million in revenue. According to Apple, Inc. ("Apple"), owner of the App Store (a digital distribution platform for mobile applications), *Pokémon Go* was downloaded more times in its first week than any other mobile application in history.  At the time this complaint was filed, mobile users were spending more time playing *Pokémon Go* than using other popular applications such as Facebook, Twitter, WhatsApp, Instagram, and Snapchat.

5.     However, within days of the game's release, it became clear that a number of the GPS coordinates that Defendants had designated as Pokéstops and Pokémon gyms were, in fact, on or directly adjacent to private property, and that Defendants had placed these Pokéstops and Pokémon gyms  on private property ***without the consent of the properties' owners***.

6.     Plaintiffs reside on Revere Street, a private cul-de-sac, in the city of St. Clair Shores, Michigan.  Across the street from Plaintiffs' home is Wahby Park, a small municipal park.  In early July, shortly after the release of *Pokémon Go*, Plaintiffs noticed a significant increase in the number of visitors to Wahby Park, from an estimated 15 to 20 visitors at any given time to at least several hundred, most of whom were visibly using their mobile phones.

3

Plaintiffs soon learned that Defendant Niantic had placed a Pokémon Gym and at least seven Pokéstops on the park, and had placed Pokémon on Plaintiffs' property as well.

7.     Over the next several weeks, Plaintiffs' once-quiet street degenerated into "a nightmare" for Plaintiffs and their neighbors.  Many of the visitors who flooded the park in search of Pokémon paid scant attention to the property boundaries of Plaintiffs and other residents of Revere Street, and likewise disregarded the clearly posted sign advising that Revere Street was a private road, with parking for residents and their guests only.  *Pokémon Go* players parked their cars in front of Plaintiffs' and their neighbors' homes, blocking their driveways.  *Pokémon Go* players trespassed on Plaintiffs' and their neighbors' lawns, trampling their landscaping and peering into their windows.  When Mrs. Gotts-Dodich asked a *Pokémon Go* player to leave her property, she was told to "shut up B****, or else."

8.     In late July, Plaintiffs requested the removal of the Pokéstops and Pokémon Gym that Niantic had placed near their home, using the designated request form on the company's website.  In response, they received only an automated form reply: "Thank you for reporting this PokéStop/Gym.  We will review and take appropriate action.  You'll receive a follow-up email once your request has been reviewed."

9.     Days later, Plaintiffs had yet to receive the promised response from Niantic, and submitted two more requests via emails to Niantic's legal department and directly to Niantic's Chief Executive Officer ("CEO") John Hanke (using an email address found online), describing to Niantic the conditions the company's actions had created on Revere Street.  The emails told Niantic that the Pokéstops and Pokémon gyms had "creat[ed] havoc"; that *Pokémon Go* players "are on our lawns . . . looking right into our windows to catch a Pokemon"; that Plaintiffs had been threatened by *Pokémon Go* players and "don't feel safe sitting on our porch"; and that after

4

the park closed at sundown, players "hid[e] on our street or in the bushes, then come right back once police leave."

10.     In response to this detailed litany of grievances, Plaintiffs again received only a generic form reply, thanking Plaintiffs again for contacting Niantic and directing them to "visit the help center[]" for *Pokémon Go* on Niantic's website.

11.     Several days later, after once again receiving no follow-up from Niantic, Plaintiffs sent a similar email to yet another Niantic email address.  Once again, Plaintiff received no reply beyond a generic form response.  At the time of the filing of this complaint, Niantic has yet to respond to Plaintiffs or to remove the Pokéstops and Pokémon gyms at issue, and Plaintiffs and their neighbors continue to describe conditions on Revere Street as "a nightmare."

12.     Plaintiffs' situation is far from unique.  Indeed, in the weeks following the release of *Pokémon Go*, it quickly became apparent that Niantic had designated properties as Pokéstops and Pokémon gyms without seeking permission from property owners and with flagrant disregard for the foreseeable consequences of doing so.  Shortly after the game's release, an individual whose Massachusetts home Niantic designated as a Pokémon gym reported more than 15 uninvited visitors in the space of only a few hours, and many more visitors over the following days.  An Alabama cemetery complained that the presence of *Pokémon Go* players was detracting from the cemetery's decorum.  Indeed, ***Niantic even placed three Pokéstops within the United States Holocaust Memorial Museum*** in Washington, D.C., prompting a complaint from the museum.

13.     The intentional, unauthorized placement of Pokéstops and Pokémon gyms on or near the property of Plaintiffs and other members of the proposed class constitutes a continuing invasion of the class members' use and enjoyment of their land, committed by Niantic on an

5

ongoing basis for Defendants' profit.  Moreover, Niantic has thus far ignored repeated requests to remove the Pokéstops and Pokémon gyms at issue.  On the basis of the foregoing acts and practices, Defendant Niantic is liable for nuisance and all Defendants have been unjustly enriched.

## JURISDICTION AND VENUE

14.    The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000.00 and there is diversity between a plaintiff and a defendant.

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant Niantic is headquartered in this district and a substantial part of the events giving rise to the claim occurred within this district.

## PARTIES

16.    Plaintiffs Scott Dodich and Jayme Gotts-Dodich are residents of St. Clair Shores, Michigan.  As described *supra* at ¶¶ 6-11, Defendant Niantic's placement of Pokémon on and near Plaintiffs' property caused *Pokémon Go* players to interfere with Plaintiffs' use and enjoyment of their property.

17.    Defendant Niantic, Inc. is a software development company headquartered in San Francisco, California 94105.  The company was formed in 2002 as Niantic Labs, an internal startup at Google Inc., and spun off as an independent entity in October 2015.  Niantic is the developer and publisher of *Pokémon Go*.  Niantic receives a percentage of all revenues generated by *Pokémon Go* mobile application.

18.    Defendant The Pokémon Company is responsible for marketing and licensing the Pokémon franchise.  Pokémon Co. is headquartered in Tokyo, Japan, and was established as a

6

joint venture by Nintendo and the two other companies holding the copyright on Pokémon (Game Freak and Creatures).  Defendant Nintendo holds a 32% ownership stake in Pokémon Co. Pokémon Co. receives a percentage of all revenues generated by the *Pokémon Go* mobile application.

19.     Defendant Nintendo Co., Ltd. is a multinational consumer and electronics software company headquartered in Kyoto, Japan.  Founded in 1889 as a playing card company, Nintendo entered the video game industry in the 1970s and today is the world's largest video game company by revenue.  Nintendo is the publisher of the popular Pokémon video game series and, as described *supra* at ¶ 18, owns a 32% stake in Defendant Pokémon Co.  Nintendo receives a percentage of all revenues generated by the *Pokémon Go* mobile application.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Created in 1995 by the Japanese video game designer Satoshi Tajiri, the Pokémon media franchise consists in large part of video games centered on fictional creatures called Pokémon.  A player's goal in Pokémon games is generally to capture as many Pokémon as possible—indeed, Pokémon's English language slogan is "Gotta Catch 'Em All"—and have the Pokémon battle one other for sport.  Published by Nintendo, the Pokémon video games have sold more than 200 million copies worldwide.

### *Pokémon Go*

21.     On July 6, 2016, Niantic released *Pokémon Go*, the latest installment of the Pokémon video game series, as a mobile phone application in the United States.  As with earlier Pokémon games, the object of *Pokémon Go* is to collect as many Pokémon as possible.  Unlike previous Pokémon games, however, *Pokémon Go* took advantage of various mobile phone

technologies—including GPS, camera, and gyroscope features—to create an "augmented reality" gaming experience, in which players discover and capture Pokémon by physically exploring their surroundings.

22.     When a player comes in close proximity to GPS coordinates determined by a Niantic algorithm, the game uses the phone's camera mode and gyroscope to display the image of a Pokémon, superimposed over the real-world image displayed on the player's phone screen, as though the Pokémon existed in the real world.   (*See* Figure 1.)   By swiping their phone screens, players may then attempt to "catch" the Pokémon to add it to their virtual collections.

23.     Additionally, Niantic selected and programmed into *Pokémon Go* the GPS coordinates of certain real world locations, designating them as "Pokéstops" and "Pokémon gyms."   At Pokéstops, players gain access to potentially vital in-game items, which they can use to catch Pokémon.   In Pokémon gyms, players gain the opportunity to engage in virtual battles with other *Pokémon Go* players, success in which advances the player's progress through the game.

24.     *Pokémon Go* was an immediate success and has been highly profitable for Defendants.   As of July 23, 2016, *Pokémon Go* had been downloaded more than 30 million times and had earned more than $35 million in revenue.   According to Apple, *Pokémon Go* was downloaded more times in its first week than any other mobile application in history.   At the time this complaint was filed, mobile users were spending more time playing *Pokémon Go* than using other popular applications such as Facebook, Twitter, WhatsApp, Instagram, and Snapchat.

**Placement of Pokéstops and Pokémon Gyms on Private Property**

25.     Within days of the game's release, it became clear that a number of the GPS coordinates that Defendants had designated as Pokéstops and Pokémon gyms were, in fact, on or

8

directly adjacent to private property, and that Defendants had placed these Pokéstops and Pokémon gyms *without the consent of the properties' owners*.

26.     As described *supra* at ¶ 6, Plaintiffs reside on Revere Street, a private cul-de-sac, across from Wahby Park, in St. Clair Shores, Michigan.  In early July, shortly after the release of *Pokémon Go*, Plaintiffs noticed a significant increase in the number of visitors to Wahby Park, from an estimated 15 to 20 visitors at any given time to at least several hundred, most of whom were clearly focused on their mobile phones.  (*See* Figure 2.)  Plaintiffs soon learned that Defendant Niantic had placed at least seven Pokéstops and one Pokémon Gym on the park.  (*See* Figure 3.)  In fact, Wahby Park topped the website *Click On Detroit*'s list of "Best places to play Pokemon Go in Metro Detroit," which described "[h]undreds of people walking around . . . .  At least six Pokestops, all constantly lured".



*Figure 2*

9



*Figure 3*
*An in-game map of Wahby Park and Revere Street (to the left),*
*displaying at least seven Pokéstops and one Pokémon Gym.*

27.    Over the next several weeks, Plaintiffs' once-quiet street degenerated into "a nightmare" for Plaintiffs and their neighbors.  Many of the visitors who flooded the park in search of Pokémon paid scant attention to the property boundaries of Plaintiffs or other residents of Revere Street, and likewise disregarded the clearly posted sign advising that Revere Street was a private road, with parking for residents and their guests only.  *Pokémon Go* players parked their cars in front of Plaintiffs' and their neighbors' homes, blocking their driveways.  (*See* Figure 4.)  *Pokémon Go* players trespassed on Plaintiffs' and their neighbors' lawns, trampling their landscaping and peering into their windows.  (*See* Figure 5.)  When Mrs. Gotts-Dodich asked a *Pokémon Go* player to leave her property, she was told to "shut up B****, or else."



*Figure 4*



*Figure 5*

28.     On or around July 25, 2016, Plaintiffs requested the removal of the Pokéstops and

Pokémon Gym that Niantic had placed near their home, using the designated request form on the

company's website.  In response, they received only an automated form reply: "Thank you for

11

reporting this PokéStop/Gym.  We will review and take appropriate action.  You'll receive a follow-up email once your request has been reviewed."

29.    Two days later, on July 27, 2016, Plaintiffs had yet to receive the promised response from Niantic, and submitted two more requests—this time, via emails directly to Niantic's legal department and John Hanke, Niantic's CEO.  The emails described to Niantic the conditions the company's actions had created on Revere Street, and stated, in part:

> At any given moment there are at least a couple of hundred people in the park play[ing] this game, compared to the average of at least 15-20 in the park.  The [Pokéstops and Pokémon gyms] . . . [are] an ***open invitation for the players to utilize our street, our lawns, looking in our windows*** . . . and so forth.  ***There are at least 30 homes*** . . . ***that are affected by this***.  ***These players are loud, make threats, [are] intrusive, and I do not feel safe.***  My husband and I moved to our home almost two years ago because it was peaceful, quite, and safe.  ***When I see people driving slow, looking into our home, walking on our property, looking into our vehicles, we do not feel safe.***  Neither do the neighbors.
> . . .
>  With all the traffic it is hard to tell who is playing the game, or casing out our street/park, someone who is looking to rob, rape or any other harm. . . .
> ***They park along our street that borders Wahby Park, we ask them to move and get threats and attitudes.  I was threatened by a man who refused to leave.  He was parked in front of my home.  I had hardly any room to back out of my driveway.***  Mind you, he was also parked the wrong way on the street.
> . . .
> I truly hope you will take this into consideration, the news has already been in the park twice, and have interviewed neighbors on this issue.

 (Emphases added.)

30.    In response to this litany of detailed grievances—which reported trespassing and personal threats, and expressed concerns about robbery and rape—Plaintiffs again received only a generic form reply, thanking Plaintiffs again for contacting Niantic and directing them to "visit the help center[]" for *Pokémon Go* on Niantic's website.

31.    Once again, Plaintiffs did not receive any follow-up from Niantic.  Accordingly, on August 1, 2016, Plaintiffs wrote yet another email to the company:

12

***The past few weeks have been an absolute nightmare*** for not only my husband and I, but for the residents on our street as well.  Almost two years ago my husband and I moved into our home, not knowing how drastically our once quiet, safe, and peaceful street has gone to the complete opposite.
. . .
Most recent I am seeking help for anxiety, I believe I will call it that and am seeking help.  I guess you could say I had a nervous breakdown, never had to encounter this feeling in my life.  ***We have veterans with PTSD and this traffic is getting to them as well.***

***Nobody gets sleep anymore. Constantly have to protect our homes from people on our property that invade, all because of the stops/gyms.*** I will highlight the issues we are having:

**Privacy:** Since our street borders the park, our privacy has been taken away from us. ***The stops/gyms border directly on our street, causing the gamers to take over our property as well as the parks. They are on our lawns, with the newest being looking right into our windows. How is this acceptable? They hang out on our lawns, trample landscaping, look in vehicles***, hang out in the middle of the street looking at our homes while playing their game, so I hope. We ask them to leave but 75% percent of the time, they ignore us or call us names. . . .

**Safety:** Along with our privacy being violated, our safety is a concern too. Our street is narrow, we have elderly, and special needs children that require a lot of care. It is not uncommon for an ambulance go down the street frequently. It is not safe for cars to be blocking emergency vehicles to get down the street to assist people that need care. ***We don't feel safe having people on our property looking into our home. Nor do we feel safe with random vehicles parking, driving slow, and hanging out on our street. We don't know who is playing the game, who is looking at our homes to break in or steal, who is a pedophile or rapist. I don't feel safe sitting on our porch, something we love to do.*** We have gotten heckled and yelled at for calling the police and we didn't ever do so. ***I have been threatened because I asked someone to leave, he said shut up b**** or else.*** What does or else mean?

**Traffic control:** We are a private street, with that being said the police cannot ticket or have vehicles removed. All day is constant traffic, either parking on the street or just driving real slow to catch the Pokemon, or just stop right in the middle of the street. When we ask these unwanted guests to leave, we are threatened, they don't listen, give attitude, and leave when they want, this goes on all night. ***Blocking driveways, parking on the wrong side of the street, sitting in driveways, you name it they are doing it.***

Look at the traffic in the park, even after dark. They scatter when it is time to leave, ***hiding on our street or in the bushes***, then come right back once police leave.

13

32.     Once again, Plaintiff received no reply beyond a generic form response.  At the time of the filing of this complaint, Niantic has yet to respond to Plaintiffs' concerns or to remove the Pokéstops and Pokémon gyms at issue, and Plaintiffs and their neighbors continue to describe conditions on Revere Street as "a nightmare."

33.     Plaintiffs' experience is not unique.  In a series of tweets on July 9, 2016, Boon Sheridan, a resident of Holyoke, Massachusetts, reported that Niantic had placed a Pokémon gym in his home.  (*See* Figure 6.)



*Figure 6*

34.     By mid-afternoon that day, Sheridan reported that "I've counted 15 people stopping by and lingering in their phones so far.  I think at least three car visits as well."  (*See* Figure 7.)



*Figure 7*

35.     In an interview with the online publication *Buzzfeed*, Sheridan "said it is a little odd that ***he has no control over his home being a significant part of the game, and never signed off on being included***."  (Emphases added.)

36.     Likewise, as reported in the online videogame publication *Gamerant*, Niantic

14

placed a Pokéstop at a private residence in Albuquerque, New Mexico, already famous as a filming location for the television show *Breaking Bad*.  *Gamerant's* article stated, in part, that the home's "yard is being besieged by intrepid *Pokémon Go* trainers who may not be aware they're stepping onto private property."

37.   Indeed, Defendants have shown a flagrant disregard for the foreseeable consequences of populating the real world with virtual Pokémon without seeking the permission of property owners.  Niantic placed **at least three Pokéstops within the United States Holocaust Memorial Museum** in Washington, D.C. (*see* Figure 8), prompting the museum to state that "Playing the game is not appropriate in the museum, which is a memorial to the victims of Nazism.  We are trying to find out if we can get the museum excluded from the game." Similarly, a representative of Mobile Memorial Gardens, a cemetery in Mobile, Alabama, has objected to the presence of *Pokémon Go* players on its property, stating "This is private.  I owe it to the families we serve to provide a sense of decorum here."



*Figure 8*

38.   Niantic has blithely acknowledged its placement of Pokéstops on private property.

advising users on the *Pokémon Go* website: "If you can't get to the Pokéstop because it's on private property, there will be more just around the corner, so don't worry!"[1]  (*See* Figure 9.)



*Figure 9*

39.     *Pokémon Go* has been immensely profitable for the Defendants, each of which receives a percentage of revenues generated by the game.  The game's profitability derives from its popularity, which, in turn, derives in large part from its innovative augmented reality experience, in which playing *Pokémon Go* turns a user's surroundings into a virtual world of beacons to be activated and Pokémon to be captured.

40.     To create that immersive world, Niantic made unauthorized use of Plaintiffs' and other Class members' property by placing Pokéstops and Pokémon gyms thereupon or nearby. In so doing, Niantic has encouraged *Pokémon Go*'s millions of players to make unwanted incursions onto the properties of Plaintiffs and other members of the class—a clear and ongoing invasion of their use and enjoyment of their land from which Defendants have profited and continue to profit.

---

[1] https://www.niantclabs.com/terms/pokemongo/en, accessed on July 22, 2016.

## CLASS ACTION ALLEGATIONS

41.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) and/or (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

42.      The proposed nationwide class (the "Class") Plaintiffs seek to represent is defined as follows:

> All persons in the United States who own property (i) the GPS coordinates of which were designated by Defendants, without authorization, as Pokéstops or Pokémon gyms in the *Pokémon Go* mobile application or (ii) abutting property the GPS coordinates of which were designated by Defendants, without authorization, as Pokéstops or Pokémon gyms in the *Pokémon Go* mobile application.

43.     Excluded from the Class are the Defendants; any entity or division in which they have a controlling interest; their legal representatives, officers, directors, assignees, and successors; and their current or former employees.  Plaintiffs reserve the right to amend the Class definitions and to add additional sub-Classes as appropriate if discovery and further investigation reveal that the Class should be expanded, otherwise divided into sub-Class, or modified in any other way.

### Numerosity & Ascertainability

44.     Although the exact number of Class members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable.

45.    The disposition of the claims of these Class members in a single action will provide substantial benefits to all parties and to the Court. Class members are readily identifiable from information and records in Defendants' possession, custody, or control.

## Typicality

46.    Plaintiffs' claims are typical of the claims of Class, as Plaintiffs and the other members of the Class sustained damages arising out of the same wrongful conduct by Defendants, as alleged herein.

## Adequate Representation

47.    Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex and class action litigation nationwide.

48.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

## Predominance of Common Issues

49.    There are numerous questions of law and fact common to Plaintiffs and Class members that predominate over any question affecting only individual Class members, the answer to which will advance resolution of the litigation as to all Class members. These common legal and factual issues include, *inter alia*:

   a.   whether Defendants designated GPS coordinates located on or near private
        property as Pokéstops or Pokémon gyms;

   b.   whether Defendants' conduct constituted a trespass and/or nuisance at
        common law and if so, what remedies are available by law;

18

c.   whether Defendants were unjustly enriched by their actions as alleged herein;

d.   whether the Court should enjoin Defendants from continuing to engage in the conduct complained of herein;

e.   the appropriate measure of relief, including, but not limited to, a preliminary and/or permanent injunction; and

f.   the extent of the damages caused by Defendants' acts.

**Superiority**

35.     Plaintiffs and other Class members have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

36.     Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class members' claims, it is likely that few if any Class members could afford to seek legal redress for Defendants' misconduct as alleged herein.  Absent a class action, Class members will continue to incur damages, and Defendants' misconduct will continue without remedy.

37.     Class action treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class action treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

**COUNT I**
**(Nuisance)**
**(Brought on Behalf of Plaintiffs and the Class**
**against Niantic)**

38.     Plaintiff repeats, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

39.     At common law, an invasion of one's use and enjoyment of their land, if repeated or of long duration, constitutes a nuisance.

40.     As described above, via designation of specific GPS coordinates, Niantic intentionally placed virtual Pokéstops and Pokémon gyms on or near the properties of Plaintiffs and other members of the proposed Class.

41.     Niantic undertook the foregoing conduct without authorization from Plaintiffs or other members of the proposed Class.

42.     The foregoing conduct has resulted in foreseeable incursions by *Pokémon Go* players onto the property of Plaintiffs and the other members of the proposed Class, thereby invading their use and enjoyment of their properties.

43.     The invasion described above remains ongoing, as at the time of the filing of this Complaint, Niantic continued to designate GPS coordinates on or near the properties of Plaintiffs and other members of the proposed Class as Pokéstops and Pokémon gyms in *Pokémon Go*.

44.     The foregoing conduct constitutes a nuisance.

45.     As a direct and proximate result of Niantic's actions, Niantic is liable to Plaintiffs and the other members of the proposed Class.

20

## COUNT II
### (Unjust Enrichment)
### (Brought on Behalf of the Plaintiffs and the Class against all Defendants)

46.     Plaintiffs repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

47.     Defendants have received and retained a benefit from Plaintiffs and other members of the proposed Class, resulting in inequity.

48.     By designating GPS coordinates on or near the properties of Plaintiffs and other members of the proposed Class as Pokéstops and Pokémon gyms in the *Pokémon Go* game, Defendants created a more immersive gaming experience, thereby increasing the game's popularity and profitability, while encouraging millions of *Pokémon Go* players to make incursions onto the properties of Plaintiffs and other members of the proposed Class.

49.     As described *supra* at ¶¶ 17-19, each of the Defendants receives a percentage of all revenues generated by *Pokémon Go*.

50.     As a result of the foregoing conduct, Defendants have been unjustly enriched.

51.     The amount of Defendants' unjust enrichment should be disgorged, in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs demand judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Federal Rule of Civil Procedure 23, and certifying Plaintiffs as the Class representative;

B.     Awarding Plaintiffs and the other members of the Class damages, disgorgement or other monetary or equitable relief provided by and pursuant to the common law claims cited above or as the Court deems just proper;

21

C.      Enjoining Defendants from continuing the wrongful acts and practices alleged;

D.      Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest;

E.      Awarding Plaintiffs and the other members of the Class reasonable attorneys' fees and costs of suit, including expert witness fees; and

F.      Awarding such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury.

Dated:   August 10, 2016

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
Email:  jpafiti@pomlaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
Email:  jalieberman@pomlaw.com
         ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiffs*

22